UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

EVERLAST WORLD'S BOXING HEADQUARTERS
CORPORATION,

                              Plaintiff,

                                -v-

RINGSIDE, INC., COMBAT BRANDS, LLC and RAL,
LLC,

                              Defendants.

-----------------------------------------------------------------------X

            12 Civ. 5297 (PAE)

            <u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

       Plaintiff Everlast World's Boxing Headquarters Corporation ("Everlast") brought this action against Ringside, Inc. ("Ringside"), Combat Brands, LLC ("Combat"), and RAL, LLC ("RAL") (collectively, "Defendants"), alleging that Defendants breached contracts with Everlast; infringed Everlast's trademarks in violation of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), (c); and were unjustly enriched. Defendants now jointly move to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) or, in the alternative, to transfer this case to the United States District Court for the District of Kansas, pursuant to 28 U.S.C. § 1404(a). For the following reasons, the motion to transfer venue is granted, and Defendants' motion to dismiss for lack of personal jurisdiction is denied without prejudice.

I.      **Background**[1]

    **A.  The Parties**

Everlast is a New York corporation with offices in New York.  Compl. ¶ 5.  A recognizable brand in the boxing industry, Everlast designs, manufactures, and licenses boxing products and other sporting goods and equipment.

    Ringside is a Kansas corporation with offices in Kansas.  It is owned by John Brown.  *Id.* ¶ 6.  Ringside designs and sells its own boxing products; it also sells boxing equipment made by others, including Everlast.  On October 29, 2012, Ringside filed for bankruptcy in the United States Bankruptcy Court for the District of Kansas.  *See* Dkt. 17.

    RAL is a Kansas limited liability company with offices in Kansas.  Everlast alleges that it operates out of the same premises as Ringside.  Compl. ¶ 8.  RAL is also owned by Brown.  It was formed on June 21, 2012.  *Id.*

---

[1] The Court's account of Everlast's factual allegations is drawn from Everlast's Complaint ("Compl."), Dkt. 1.  For context, the Court also cites Everlast's brief in opposition to the motion to dismiss ("Pl. Br."), Dkt. 15, and the Affidavits of Jed R. Schlachter ("Schlachter Aff."), Dkt. 13, and Neil Morton ("Morton Aff."), Dkt. 14, both filed in support of that opposition.  On a motion to dismiss for failure to state a claim for relief pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court is required to assume the truth of the allegations in the complaint and to draw all inferences in the plaintiff's favor.  *Galiano v. Fid. Nat'l Title Ins. Co.*, 684 F.3d 309, 311 (2d Cir. 2012).  Here, however, defendants move on other grounds.  On a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the Court may look beyond the four corners of the complaint and consider all pleadings and accompanying affidavits and declarations, while still "resolving all doubts in [plaintiff's] favor." *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (citation omitted); *Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs. Ltd.*, No. 94 Civ. 5620 (JFK), 1997 WL 401810, at *2 (S.D.N.Y. July 16, 1997).  And, in deciding a motion to transfer venue, the Court may consider factual submissions, including declarations, by defendants, who have the burden to justify a change of venue.  *See, e.g.*, *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir. 1978), *overruled on other grounds by Pirone v. MacMillan, Inc.*, 894 F.2d 579 (2d Cir. 1990); *Mastercard Int'l, Inc. v. Lexcel Solutions, Inc.*, No. 03 Civ. 7157 (WHP), 2004 WL 1368299, at *6 (S.D.N.Y. June 16, 2004) (relying on defendant's declarations in granting motion to transfer, while denying motion to dismiss for lack of personal jurisdiction).  The Court considers, for these purposes, Defendants' brief in support of their motion to dismiss ("Def. Br.") and the declarations of John Brown ("Brown Decl.") and Greg Orman ("Orman Decl.").

Combat is a Kansas limited liability company with offices in Kansas.  Everlast alleges that Combat, like RAL, operates out of the same premises as Ringside.  *Id.* ¶ 7.  Combat was formed on June 19, 2012.  *Id*.

### B.  Everlast's Allegations

By way of overview, Everlast alleges that Ringside infringed on its trademarks and was assisted in doing so by Combat and RAL, entities which Ringside allegedly formed to enable it to perpetuate Ringside's infringement and shield it from creditors.  Everlast alleges, first, that Ringside breached two trademark license agreements (collectively, the "License Agreements") by failing to make required payments to Everlast for using its trademark, including by selling products containing Everlast's trademarks.  Everlast further alleges that, after Ringside found itself in dire financial straits, it formed Combat and RAL to shield itself from creditors and sustain its business operations under their names.  It alleges that RAL and Combat took over Ringside's inventory and sold Ringside's goods, including products bearing Everlast's trademark.  Everlast alleges that Ringside and RAL have common ownership, that Combat and Ringside have common employees and officers, and that all three entities operate from the same premises.  On these bases, Everlast alleges that RAL and Combat are liable under alter ego, successor, and/or de facto merger theories for trademark infringement and breach of contract.

### 1.  The License Agreements

In the License Agreements, Ringside licensed from Everlast (1) the right to use Everlast's trademarks on boxing products in the United States and Canada (the "Boxing Products Agreement"), and (2) the right to use such trademarks on products Ringside sold through Everlast's catalogue and website (the "Catalogue and Website Agreement").  The License Agreements are governed by New York law.  Compl. ¶ 3.

On or about February 4, 2009, Everlast and Ringside entered into the Boxing Products Agreement.  *Id.* ¶ 9.  Under that agreement, Everlast gave Ringside the right to use certain Everlast trademarks on its products for 10 years, in exchange for Ringside's agreement to pay Everlast royalty payments each quarter.  *Id.* ¶¶ 9–12.  The agreement also provided for guaranteed annual minimum royalties between 2012 and 2018, which together totaled $1,660,254.93.  *Id.* ¶ 11.  The agreement specified that in the event of a termination, all royalties owed to Everlast were payable immediately.  *Id.* ¶ 13.  Further, if Ringside failed to make timely payments, Everlast could provide a notice to Ringside demanding payment, and could terminate the agreement if Ringside failed to pay the overdue money within 10 days of Everlast's demand. *Id.* ¶ 20.

On or about February 11, 2010, Everlast and Ringside entered into the Catalogue and Website Agreement.[2]  *Id.* ¶ 14.  It required Ringside to purchase a minimum annual value of products from Everlast each year over a seven-year period, beginning on May 1, 2012.  *Id.* ¶¶ 14–17.  Over the life of the agreement, the amounts which Ringside committed to buy totalled $28,408,364.89.  *Id.* ¶ 16.  The Catalogue and Website Agreement also contained a provision requiring Ringside, upon termination, to pay Everlast all amounts due.  *Id.* ¶ 18.  It further permitted Everlast to terminate the agreement if Ringside breached a material term of any agreement with Everlast.  *Id.* ¶ 19.

Everlast represents that various acts relating to the two License Agreements occurred in New York City.  Specifically: (1) the License Agreements were negotiated and finalized between representatives for Everlast and Ringside in New York City, Morton Aff. ¶ 2; (2) Ringside

---

[2] On June 3, 2011, that Agreement was amended.  Compl. ¶ 14.  The original and amended agreements are referred to together here as the "Catalogue and Website Agreement."

representatives, including Brown, the owner and current Ringside president, and Joe Taylor, Ringside's former president, visited Everlast's offices in New York frequently to discuss and review business between the two companies, *id.* ¶ 3; (3) Ringside sent payments—including more than $3.5 million for Everlast products from 2009–2011—to Everlast in New York, *id.* ¶ 4; and (4) Ringside has sold products in New York City to New York residents, Compl. ¶ 3.

### 2. Termination of the License Agreements

Everlast alleges that by mid-2012, Ringside was in the process of liquidation.  Compl. ¶ 40.  On May 31, 2012, Everlast gave Ringside written notice pursuant to the Boxing Products Agreement of its overdue debts to Everlast.[3]  *Id.* ¶ 20.  Ringside failed to cure its alleged breach within the 10-day deadline provided by the Agreement.  On June 14, 2012, Everlast terminated the Boxing Products Agreement and gave Ringside notice of termination.  *Id.* ¶ 25.  That same day, Everlast also terminated the Catalogue and Website Agreement, based on Ringside's alleged breach of the Boxing Products Agreement.  *Id.* ¶ 26.  Ringside received notices of both terminations.  *Id.* ¶ 27.  Five days later, Everlast directed Ringside's then-president, Orin Borgelt, that Ringside was not authorized to sell any Everlast-licensed products.  *Id.* ¶ 30.

### 3. Formation of RAL and Combat

On June 19, 2012, the same day that Everlast instructed Borgelt to cease selling any Everlast-licensed products, Combat was formed.  Compl. ¶ 32.  Two days later, Brown— Ringside's owner and president—formed RAL.  *Id.* ¶ 31.  RAL and Combat operate from the same premises as Ringside, operate Ringside's website, conduct business under the name, "Ringside," and have, as their employees, various staff and management of Ringside.  *Id.* ¶ 39.

---

[3] One week later, a state court in Kansas, acting after a secured lender initiated a foreclosure action, appointed a receiver to take control of Ringside.  Compl. ¶ 40.  On June 26, 2012, the Johnson County district court dismissed the receiver.  *Id.*  On October 29, 2012, Ringside filed for bankruptcy.  *See* Dkt. 17.

Further, Borgelt, Ringside's president until June 19, 2012, is an employee and officer of Combat, and as recently as July 3, 2012, continued to send e-mails to Everlast from a Ringside e-mail address.  *Id.* ¶ 37.  Ringside also used the name "Combat Brands" in the course of its business. *Id.* ¶ 34.

To bolster its claim that RAL was formed to divest Ringside of its assets, Everlast notes that Ringside sold its assets to RAL and Combat in June 2012, days after those two entities were formed.  These asset purchases were memorialized in a "Settlement and Release Agreement" among, *inter alia*, Ringside, RAL, Combat, and Ringside's secured lender.  Schlacter Aff. ¶ 4, Ex. 1.  That agreement, in turn, referenced an agreement in which Combat purportedly purchased certain Ringside assets from Ringside's lender for $1.55 million.  *Id.* § 3(a).  The settlement agreement also references another agreement between RAL and Ringside, under which RAL was to pay $600,000 to Ringside's lender for any remaining Ringside assets, *id.* § 3(d); because RAL did not have the money to pay the lender for the assets, the agreement calls for it to borrow that money from the lender on the condition that *Combat* would pay $25,000 were RAL to default. *Id*.  The agreement notes that if any person or entity had a security interest or lien in RAL's assets ahead of the lender, Combat would have to pay the lender the full $600,000.  *Id*. § 3(f).

Everlast alleges that Combat has acted as a selling agent for RAL, which took over Ringside's inventory, including its Everlast-licensed products, in order to sustain Ringside's business operations.  Everlast alleges that under a consignment agreement between RAL and Combat, RAL was to transfer merchandise to Combat for Combat to sell.  Schlacter Aff. ¶ 6, Ex. 3.  It further alleges that, under that agreement, Combat was to collect RAL's accounts receivable, even though RAL, as a newly-formed entity, presumably had no accounts receivable

as of the date of the agreement.  *Id.* ¶ 10.  Everlast infers that, given their common ownership, Combat was effectively succeeding to Ringside's accounts receivable.  Schlacter Aff. ¶ 6.

### C.  Procedural History

On July 9, 2012, Everlast filed the Complaint.  Dkt. 1.  It recited seven causes of action, all arising out of the alleged breach by Ringside of the License Agreements.  These claims were for breach of contract (two claims); trademark infringement, dilution, and false designation of origin; unjust enrichment; and for a permanent injunction.  Compl. ¶¶ 43–91.

On August 17, 2012, Defendants jointly moved to dismiss for lack of personal jurisdiction; in the alternative, they moved for a transfer of venue to the District of Kansas.  Dkt. 6.  Defendants argued that personal jurisdiction was lacking because they (in particular RAL and Combat) lacked sufficient minimum contacts with New York.  In seeking transfer to Kansas, Defendants argued that the underlying events, and other relevant factors, lopsidedly favored Kansas over New York.

On September 28, 2012, Everlast filed its opposition to the motion.  Dkt. 15.  It noted that the License Agreements had been negotiated in New York, and that Ringside had frequent business transactions in New York.  Although it did not identify activities in New York on the part of RAL and Combat, it argued that, as successors to Ringside, they are appropriately sued in New York.  On October 12, 2012, Defendants filed their reply.  Dkt. 16.

On October 29, 2012, while this motion was pending, Ringside filed for bankruptcy in federal bankruptcy court in Kansas.  *See* Dkt. 17.  That filing triggered an automatic stay as to Ringside, pursuant to the Bankruptcy Code, *see* 11 U.S.C. § 362 (a)(1).  That stay remains in place.  *In re Asset Resolution Corp.*, No. 2:12-BK-22932 (D. Kan. Bankr. Oct. 29, 2012).

Notwithstanding the bankruptcy stay as to Ringside, the remaining parties—Everlast, RAL, and Combat—all favor resolution of Defendants' motion now. The Court accordingly addresses this motion. Dkts. 20, 21.

## II.   Discussion

### A. Threshold Considerations

Although it is common to resolve challenges to personal jurisdiction before addressing motions to transfer venue, *see Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979); *Cavit Cantina Viticoltori Consorzio Cantine Sociali Del Trentino Societa' Cooperativa v. Browman Family Vineyards, Inc.* ("*Cavit Cantina*"), 656 F. Supp. 2d 421, 424 (S.D.N.Y. 2009) (citing *Leroy*, 443 U.S. at 180)), it is not required that courts do so. Courts may instead address venue applications at the threshold, "when there is a sound prudential justification for doing so," because "neither personal jurisdiction nor venue is fundamentally preliminary in the sense that subject-matter jurisdiction is." *Leroy*, 443 U.S. at 180; *Cavit Cantina*, 656 F. Supp. 2d at 424.

In particular, reaching a venue motion in lieu of first addressing personal jurisdiction is sensible where the question of whether there is personal jurisdiction over a defendant is close and likely to yield further litigation. *Cavit Cantina*, 656 F. Supp. 2d at 424 (deciding venue first because "a substantial and genuine debate" existed over whether personal jurisdiction over defendant would be proper); *see also Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger, P.C.*, 927 F. Supp. 731, 735 (S.D.N.Y. 1996) (also deciding venue first). To address a venue challenge does not require a preliminary finding that "the transferring court has personal jurisdiction over the defendants." *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 465 (1962). Further, where personal jurisdiction would likely exist in the transferee district over a defendant who contests personal jurisdiction in the Southern District of New York, it is "prudentially

appropriate to address venue first since a decision to transfer would render personal jurisdiction analysis with respect to [the Southern District] irrelevant." *Basile v. Walt Disney Co.*, 717 F. Supp. 2d 381, 385–86 (S.D.N.Y. 2010); *see also Corke v. Sameiet M.S. Song of Nor.*, 557 F.2d 77, 79–80 (2d Cir. 1978); *Volk Corp. v. Art-Pak Clip Art Serv.*, 432 F. Supp. 1179, 1181 (S.D.N.Y. 1977) ("[The Court] has power to transfer the case even if there is no personal jurisdiction over the defendants, and whether or not venue is proper in [the] district, if a transfer would be in the interest of justice.").

Here, it is doubtful that personal jurisdiction exists over RAL and Combat in the Southern District of New York, but clear that personal jurisdiction would exist over them in the District of Kansas.  There is no allegation that either RAL or Combat contracted to do business in New York, or did business in New York, either directly or through representatives.  Indeed, in a tacit recognition of its dubious claim of personal jurisdiction, Everlast has asked the Court to order jurisdictional discovery, presumably in the hope of unearthing facts supporting personal jurisdiction here.  *See* Pl. Br. 7.  Lacking evidence of any New York activities on the part of RAL and Combat, Everlast argues that personal jurisdiction exists over those two entities derivatively, based on their connections to Ringside.  However, whether or not such an argument is sustainable in the abstract, it is a particularly thin reed on which to premise personal jurisdiction here, with Ringside effectively absent from trial as a result of the bankruptcy stay.  By contrast, the District of Kansas assuredly has personal jurisdiction over RAL and Combat.  Both are Kansas companies doing business in Kansas.  It is, therefore, prudent for the Court to address the motion to transfer venue first.

### B.  The Motion to Transfer Venue

Defendants' motion to transfer venue begins with the premise that venue is improper in this district.  Under 28 U.S.C. § 1391, venue is proper in a judicial district "in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of that property that is the subject of the action is situated."  District courts are "required to construe the venue statute strictly."  *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005) (for venue to be proper, "*significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere").  In the context of contract disputes, relevant factors include the locations where the contract was negotiated, where the work was to be performed, and where the contract was allegedly breached. *See id.* (citing *Matera v. Native Eyewear*, 355 F. Supp. 2d 680, 686 (E.D.N.Y. 2005)).

As with the issue of personal jurisdiction, it is a close question whether there is venue in New York.  To be sure, there would be venue as to claims against Ringside.  But, because Everlast does not allege that RAL or Combat independently carried out any activities in any state other than Kansas, or that the acts that gave rise to alter ego or other derivative liability on the part of Defendants occurred in New York, its claim of venue here over claims of breach of contract by those Defendants is tenuous.  Further, even if RAL and Combat were liable under an alter ego theory, Ringside's performance, and its alleged breach, were events that dominantly occurred in Kansas.

The Court, however, need not resolve whether there is statutory venue in this district, because it is quite clear that a transfer of venue, to the District of Kansas, is warranted under 28 U.S.C. § 1404(a).  Section 1404(a) provides:  "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division

where it might have been brought."  It gives district courts wide latitude to decide whether to

transfer venue.  *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 117 (2d Cir. 1992) (citing *Stewart*

*Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)); *Guardian Life Ins. Co. of Am. v. Hernandez*,

No. 11 Civ. 2114 (SAS), 2011 WL 3678134, at *2 (S.D.N.Y. Aug. 22, 2011).  The relevant

factors under § 1404(a) lopsidedly favor transfer of this action to the District of Kansas.

Accordingly, the Court addresses that question, noting only, as to Defendants' challenge to

venue under § 1391, that Defendants have made a substantial showing that venue is lacking.  *See*

*AGCS Mar. Ins. Co. v. Associated Gas & Oil Co.*, 775 F. Supp. 2d 640, 645 (S.D.N.Y. 2011)

(addressing—and granting—a motion to transfer venue under § 1404(a) ahead of deciding venue

under § 1391, where defendant moved to dismiss for lack of personal jurisdiction and improper

venue and sought transfer under § 1404(a) in the alternative).

    In deciding motions to transfer venue under § 1404(a), courts inquire, first, "whether the

action could have been brought in the transferee district and, if yes, whether transfer would be an

appropriate exercise of the Court's discretion."  *Robertson v. Cartinhour*, No. 10 Civ. 8442

(LTS) (HBP), 2011 WL 5175597, at *3 (S.D.N.Y. Oct. 28, 2011).

    The answer to the first inquiry is yes—this action could have been brought in the District

of Kansas.  Venue is proper in "a judicial district in which any defendant resides, if all

defendants are residents of the State in which the district is located."  28 U.S.C. § 1391(b)(1).

Because both RAL and Combat reside in Kansas, venue would be proper in the District of

Kansas.

    Assessing whether transfer is a valid exercise of discretion requires the Court to balance

various factors:  (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the

location of relevant documents and the relative ease of access to sources of proof; (4) the locus

of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice. *Robertson*, 2011 WL 5175597, at *4; *Kreinberg v. Dow Chem. Co.*, 496 F. Supp. 2d 329, 330 (S.D.N.Y. 2007); *Reliance Ins. Co. v. Six Star, Inc.*, 155 F. Supp. 2d 49, 56–57 (S.D.N.Y. 2001).

### C.  Factors Favoring Transfer

Viewed together, these factors overwhelmingly favor transfer to the District of Kansas, and such transfer is an appropriate exercise of discretion.  Six of the above nine factors, in fact, clearly favor transfer to Kansas.

#### 1.  Convenience of the Witnesses

The convenience of witnesses is an important consideration, and has often been described as the single most important § 1404(a) factor.  *Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 520 (2d Cir. 1989); *Guardian*, 2011 WL 3678134, at *3; *D'Anton Jos, S.L. v. Doll Factory, Inc.*, 937 F. Supp. 320, 323 (S.D.N.Y. 1996) (citing *Pilates, Inc. v. Pilates Inst., Inc.*, 891 F. Supp. 175, 183 (S.D.N.Y. 1995)); 15 Charles Alan Wright, et al., *Federal Practice and Procedure* § 3851 (3d ed. 2007) (noting that the convenience of the witnesses factor is "[o]ften cited as the most important factor in passing on a motion to transfer under § 1404(a)" and is "one of the most frequently mentioned by courts").  In a trademark infringement action, the "most critical witnesses 'may be those officers and employees who were involved in . . . sale of the [allegedly] infringing products.'"  *ESPN, Inc. v. Quiksilver, Inc.*, 581 F. Supp. 2d 542, 548 (S.D.N.Y. 2008) (quoting *AEC One Stop Grp., Inc. v. CD Listening Bar, Inc.*, 326 F. Supp. 2d 525, 529 (S.D.N.Y. 2004)).

Here, RAL and Combat have demonstrated that the pertinent witnesses are overwhelmingly based in or near Kansas, and not New York.  Borgelt, for example, as Ringside's former president, is a critical witness both as to Everlast's claims of infringement and also as to its claims that RAL and Combat were alter egos of Ringside.  He lives in the greater Kansas City area.  *See* Brown Decl. ¶ 7.  RAL's owner has further attested that all witnesses RAL would call live in or near Kansas.  *Id*.  The same is true for Combat, which represents that all of its witnesses live either in Kansas or just over the border in Missouri.  Orman Decl. ¶ 8. These include representatives of Ringside's secured creditor, whose testimony is germane to testing Everlast's alter ego theory of liability.  *Id*.  The Kansas-based employees of RAL and Combat, whom Everlast has alleged previously worked at Ringside, are also likely percipient witnesses, both to Everlast's claims of infringement by Ringside and its claims of derivative liability by RAL and Combat.  *See generally ESPN, Inc.*, 581 F. Supp. at 548.

Everlast, revealingly, does not fundamentally contest these facts.  Instead, it asserts, lamely, that this factor has "little impact at the present time" because it is "too early to tell what non-party witnesses, if any, will ultimately be required in this matter."  Pl. Br. at 21.  That argument is unpersuasive absent a credible alternative portrait of who the trial's important witnesses might be.  Everlast does note, generally, that its employees relevant to this action are located in New York.  Morton Aff. ¶ 5.  But it does not explain why these witnesses have testimony central to issues of liability, or alter ego liability, nor does it identify such witnesses by name.

Weighing the parties' respective showings, the factor of witness convenience heavily favors the District of Kansas.  RAL and Combat have identified various indispensable or likely vital witnesses to this litigation, all of whom live in or near Kansas, and who would be

inconvenienced by having to testify in New York.  Everlast, by contrast, has failed to identify commensurately important witnesses living in New York.  And even assuming that several New York-based Everlast witnesses would testify, Kansas is still a much more convenient venue for the majority of the witnesses—and the vastly greater relative quantity of Kansas-based witnesses alone favors transfer.  *See Doll Factory*, 937 F. Supp. at 323 (transferring venue from New York to Florida where defendant identified significantly more witnesses and employees residing in or near Florida than plaintiff identified living in or near New York).

### 2.  Convenience of the Parties

"A defendant moving for transfer must show both that the original forum is inconvenient for it and that the plaintiff would not be substantially inconvenienced by a transfer."  Wright et al., *supra*, § 3849.  Where a group of defendants makes such a showing, that factor favors transfer.  *See In re Connetics*, No. 06 Civ. 11496 (SWK), 2007 WL 1522614, at *4 (S.D.N.Y. May 23, 2007) (transferring a lawsuit to a more convenient venue for defendants where plaintiff would not be considerably inconvenienced); *Ravenwoods Invest. Co. v. Bishop Capital Corp.*, No. 04 Civ. 9266 (KMK), 2005 WL 236440, at *5 (S.D.N.Y. Feb. 1, 2005) (convenience of parties "weigh[ed] heavily in favor of transfer" where plaintiff's inconvenience would be "minor" in comparison to the inconvenience that defendants would experience absent a transfer).  However, a motion to transfer "should not be granted if all transfer would accomplish is to shift the inconvenience from one party to the other."  *Guardian*, 2011 WL 3678134, at *3 (citation omitted).

Here, RAL and Combat argue that they would be substantially inconvenienced—practically and financially—by having to defend this suit in New York.  First, they note, most of their important evidence, including data, documents, records, and drawings, are located in

Kansas, where they are based.  Second, the executives of RAL and Combat have attested that, as smaller companies, they would face financial hardship if forced to defend suit in the Southern District of New York.  Combat is a start-up "still gaining its financial footing while attempting to establish itself in the marketplace."  Orman Decl. ¶ 11.  RAL "lacks the financial means" to defend the action in New York.  Brown Decl. ¶ 12.

Again, without meaningful elaboration, Everlast discounts this factor as being "of minimal significance."  Pl. Br. 21.  It posits that the ability to electronically transfer documents reduces the burden on a Kansas-based company to defend a case in New York.  *Id.*  And, reprising its generic point as to its own witnesses, it notes that its employees are located in New York.  Accordingly, Everlast argues, this factor "cuts both ways."  *Id.*

Although Everlast is correct that document-related burdens are less consequential in today's world of electronic storage and transmission, on balance, this factor favors RAL and Combat.  First, there are two defendants and one plaintiff—thus two entities are disfavored by trial in New York, but only one is disfavored by trial in Kansas.  Second, the defendant companies have attested, without meaningful refutation, that the costs associated with litigation in New York would burden them, as small companies.  Everlast does not make a comparably credible argument as to the burden it would face were its lawsuit against these Kansas companies tried in Kansas.  Third, as addressed earlier, the Court is persuaded that the substantial majority of witnesses are Kansas-based.  It is fair to conclude that witness-related inconveniences and costs that a party may bear (*e.g.*, transportation, hotels, meals, logistical planning, etc.), would present a greater burden to RAL and Combat were trial held in New York than to Everlast if trial were held in Kansas.  This factor, therefore, also favors transfer.  *See Ravenswood Invest. Co.*, 2005 WL 236440, at *5.

### 3. Locus of Operative Facts

"The location of the operative events is a primary factor in determining a § 1404(a) motion to transfer." *Smart v. Goord*, 21 F. Supp. 2d 309, 316 (S.D.N.Y. 1998) (citation omitted). It substantially favors transfer from this district when a party "has not shown that any of the operative facts arose in the Southern District of New York." *Dr. Boy GmbH v. Nationwide Ins.*, No. 96 Civ. 3217 (AGS), 1996 WL 350699, at *2 (S.D.N.Y. June 25, 1996). A transfer to a district where the key operative events occurred serves "the interests of justice." *Cohn v. Metro. Life Ins., Co.*, No. 07 Civ. 0928 (HB), 2007 WL 1573874, at *3 (S.D.N.Y. May 31, 2007) (citation omitted) ("[W]here there is no material connection between this district and the operative facts[,] the interests of justice require the transfer of the action.").

"To determine the locus of operative facts, a court must look to the site of the events from which the claim arises." *AVEMCO Ins. Co. v. GSV Holding Corp.,* No. 96 Civ. 8323 (LAP), 1997 WL 566149, at *6 (S.D.N.Y. Sept. 11, 1997) (citation omitted). In a contract case, the locus of operative facts is determined by the location where the contract was negotiated or executed, where the contract was to be performed, and where the alleged breach occurred. *Ivy Soc'y Sports Grp., LLC v. Baloncesto Superior Nacional*, No. 08 Civ. 8106 (PGG), 2009 WL 2252116, at *6 (S.D.N.Y. July 28, 2009). In the context of § 1404(a) venue analysis, a court "may determine that there are several loci of operative facts." *Adams v. Key Tronic Corp.*, No. 94 Civ. A0535 (MBM), 1997 WL 1864, at *4 (S.D.N.Y. Jan. 2, 1997).

The one event that favors New York is where the contract was executed. But the defendant that executed that contract, Ringside, is not a party to the lawsuit as presently contemplated. Rather, the suit against it is stayed, and RAL and Combat are not alleged to have played any role in the contract's formation, or even to have existed at the time the

16

Ringside/Everlast contract came into being.  The lawsuit as to these entities would therefore likely turn heavily on Everlast's claim of breach, and its claim that the events of June 2012 give rise to alter ego liability on the parts of RAL and Combat.  Viewed in this light, the case turns on events that occurred in Kansas.  Defendants correctly assert that "every single 'wrong' alleged by plaintiff occurred in Kansas."  Def. Br. 22; *see also* Brown Decl. ¶ 5 and Orman Decl. ¶ 6 (attesting that officials from neither Combat nor RAL ever visited New York).  Further, Ringside's performance—or breach—turns on conduct that occurred, or was obligated to occur, in Kansas.  *See* Brown Decl. ¶ 4 ("All of the work to be performed by Ringside pursuant to its contractual relationship with plaintiff was to be performed in Kansas; none was to be performed in New York.").  Put differently, whether valid or not, Everlast's alter ego theory turns on business activities among the three defendants that undisputedly occurred in Kansas, not New York.

Notably, Everlast is all but mum as to this factor in its brief, save to note that its License Agreements with Ringside were negotiated and finalized in New York and that *Ringside* representatives often visited New York in connection with those agreements.  *See* Pl. Br. 19–21. But, for the reasons noted, those events, although of background relevance, are not the central ones on which this lawsuit is likely to turn.  This factor, therefore, emphatically favors the District of Kansas.  *See, e.g.*, *AVEMCO Ins. Co.*, 1997 WL 566149, at *6 (granting defendant's motion to transfer where the "pivotal issue" in case arose out of conduct and events in the transferee district); *Cohn*, 2007 WL 1573874, at *3 (emphasizing the importance of this factor when there is no material connection between the transferor district and operative facts).

### 4.  Availability of Process to Compel the Attendance of Unwilling Witnesses

Although of secondary importance, the availability of process to compel the attendance of unwilling witnesses favors Kansas.  This factor is closely aligned with the first—witness convenience.  It reflects the dislocations and inequities that can arise when a court is unable to compel witnesses to testify.  *See Romano v. Banc of Am. Ins. Servs.*, 528 F. Supp. 2d 127, 133 (E.D.N.Y. 2007) ("Certainly to fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most litigants." (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 511 (1947))); *Royal Ins. Co. of Am. v. United States*, 998 F. Supp. 351, 354 (S.D.N.Y. 1998) (transferring an action in part because of the importance of the availability of process to compel witnesses to give live testimony).  Neither party concretely identifies particular witnesses likely to present attendance challenges.  However, because the key witnesses overwhelmingly live in or near Kansas, it is more likely that any such situation would arise in connection with a New York-based trial.

### 5.  Relative Means of the Parties

For the reasons described in connection with the convenience of the parties, the relative means of the parties favors Kansas.  RAL and Combat have declared that they may face substantial financial hardship if forced to defend this lawsuit in Manhattan.  A start-up company, Combat is "still gaining its financial footing while attempting to establish itself in the marketplace."  Orman Decl. ¶ 11.  RAL, in turn, "lacks the financial means" to defend the action in New York.  Brown Decl. ¶ 12.  Everlast, by contrast, has made no analogous claim of financial adversity presented by pursuing its claims in Kansas.

### 6.  Trial Efficiency and Interests of Justice

The Court also must consider trial efficiency and interests of justice.  In this respect, "[t]he benefits of consolidating related cases in a common forum are often substantial."  *Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. Am. Boat Co., LLC*, No. 11 Civ. 6804 (PAE), 2012 WL 1382278, *at 3 (S.D.N.Y. Apr. 20, 2012).  "Such consolidation may advance the strong policy interests of achieving efficient pretrial discovery, avoiding duplicative litigation, and avoiding inconsistent results."  *Id.*; *see also Robertson*, 2011 WL 5175597, at *4; *Kreinberg*, 496 F. Supp. 2d at 331; *Goggins v. Alliance Capital Mgmt., L.P.*, 279 F. Supp. 2d 228, 234–35 (S.D.N.Y. 2003); *Comprehensive Care Corp. v. Bank of Tokyo Trust Co.*, No. 90 Civ. 4387 (MJL), 1991 WL 150220, at *4–5 (S.D.N.Y. July 30, 1991); *Durham Prods., Inc. v. Sterling Film Portfolio, Ltd.*, 537 F. Supp. 1241, 1243 (S.D.N.Y. 1982).

Here, the Court notes, Ringside's ongoing bankruptcy is the subject of a pending proceeding in the United States Bankruptcy Court in the District of Kansas.  To be sure, it is not, at this point, clear that efficiencies will be realized by siting this litigation in the same district as the one in which Ringside's bankruptcy case is proceeding.  But it is fair to infer that siting these matters in the same district may realize efficiencies or reduce avoidable inefficiencies—whether in terms of mitigating burdens on counsel and witnesses or promoting greater coordination among these related actions.  This factor, although modest in weight because of its conjectural nature, thus slightly favors transfer to the District of Kansas.

### D.  Neutral Factors

The location of relevant documents and the relative ease of access to sources of proof do not materially favor either side.  Given electronic discovery, and absent any concrete illustration

of inconvenience to either side relating to documents or other non-testimonial evidence, this

factor does not materially favor either venue.  *See Guardian*, 2011 WL 3678134, at *3.

### E.  Factors Favoring New York

#### 1.  The Forum's Familiarity with Governing Law

The forum's familiarity with governing law favors the Southern District of New York.

That is because the License Agreements are expressly governed by New York law.  However,

this factor merits little weight.  In general, this factor is "one of the least important factors in

determining a motion to transfer, especially where no complex questions of foreign law are

involved."  *ACE Am. Ins. Co. v. Bank of the Ozarks*, No. 11 Civ. 3146 (PGG), 2012 WL

3240239, at *13 (S.D.N.Y. Aug. 3, 2012) (quoting *Posven, C.A. v. Liberty Mut. Ins. Co.*, 303 F.

Supp. 2d 391, 405 (S.D.N.Y. 2004)); *Lesser v. Camp Wildwood*, No. 01 Civ. 4209 (RWS), 2002

WL 1792039, at *6 (S.D.N.Y. Aug. 2, 2002); *Vassallo v. Niedermeyer*, 495 F. Supp. 757, 760

(S.D.N.Y. 1980).  Such is the case here.  Indeed, Everlast has not argued, nor could it

persuasively, that this case turns on nuanced issues of New York state law that this Court is

materially more qualified to apply than a Kansas court would be.

#### 2.  Plaintiff's Choice of Forum

The plaintiff's choice of forum is the sole important factor that favors keeping the action

in New York.  Everlast selected this district as a forum presumably more convenient to it, and

presumably not anticipating that Ringside's later bankruptcy proceeding would shift the focus of

the case towards the conduct of the two defendants that lacked any direct nexus to New York.

This factor, however, is offset, and then some, by the other factors addressed above.  To be sure,

the Court recognizes that a plaintiff's choice of forum is accorded considerable weight in the

§ 1404(a) balancing test.  *See, e.g.*, *Bukhari v. Deloitte & Touche LLP*, No. 12 Civ. 4290 (PAE),

2012 WL 5904815, at *5 (S.D.N.Y. Nov. 26, 2012) (collecting cases). But that choice merits less deference "where the connection between the case and the chosen forum is minimal." *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 401 (S.D.N.Y. 2010); *see also Terra Secs. ASA Konkursbo v. Citigroup*, 688 F. Supp. 2d 303, 315 (S.D.N.Y. 2010); *Doll Factory*, 937 F. Supp. at 323 ("[A]lthough a plaintiff's choice of forum is generally given substantial weight, this presumption does not apply in cases such as this one where there is little material connection between the chosen forum and the facts and issues of the case."). Such is the case here, where the facts in this action, particularly insofar as they pertain to RAL and Combat, lack a strong, material connection to this district. This factor does not come close to shifting the balance of factors in favor of this district.

## CONCLUSION

For the foregoing reasons, Defendants' motion to transfer venue pursuant to 28 U.S.C., Section 1404(a) is granted. The motion to dismiss for lack of personal jurisdiction is denied without prejudice. The Clerk of Court is directed to terminate the motion pending at docket number 6, and to transfer this case to the District of Kansas.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 4, 2013
New York, New York